## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**RAY ALVIN HUNDLEY,**

     **Plaintiff,**

**vs.**                              **CIVIL ACTION NO. 3:18-CV-01542**

**ANDREW SAUL, COMMISSIONER OF**
**SOCIAL SECURITY[1],**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered December 26, 2018 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 16, 18)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for remand or for entry of an award for benefits (ECF No. 16), **GRANT** Defendant's request to affirm

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). See also, Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (stating action survives regardless of any change in the person occupying the Office of the Commissioner of Social Security).

the decision of the Commissioner (ECF No. 18); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

<u>Procedural History</u>

The Plaintiff, Ray Alvin Hundley, (hereinafter referred to as "Claimant"), protectively filed his application[2] for Title II benefits on May 13, 2015, alleging disability since April 24, 2012, because of "nerve damage in neck and back, hard [of] hearing, anxiety, depression, high blood pressure, head injuries, memory loss, panic attacks, fractures in back." (Tr. at 62, 234) His claim was initially denied on February 12, 2016 (Tr. at 110-114) and again upon reconsideration on April 28, 2016. (Tr. at 119-125) Thereafter, Claimant filed a written request for hearing on May 11, 2016. (Tr. at 126-127)

An administrative hearing was held on January 8, 2018 before the Honorable Melinda Wells, Administrative Law Judge ("ALJ"). (Tr. at 36-61) On March 23, 2018, the ALJ entered an unfavorable decision. (Tr. at 17-35) On April 10, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 15-16, 177-181) The ALJ's decision became the final decision of the Commissioner on October 25, 2018 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On December 26, 2018, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Brief in Support of Motion for

---

[2] Claimant previously filed for disability benefits on January 28, 2013 which had been denied initially on April 8, 2013 and upon reconsideration on December 5, 2013. (Tr. at 20) The ALJ did not find any new evidence had been submitted in support of his subsequent application prior to the December 5, 2013 decision and therefore, did not find good cause for reopening the prior application prior to December 6, 2013 pursuant to 20 C.F.R. § 404.988(b). (Id.)

Judgment on the Pleadings (ECF No. 16), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 18). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 42 years old as of the alleged onset date and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 29, 223) Claimant has a high school education, a welding certificate, and had previously worked as a blaster helper in the coal mining industry, classified as a "heavy duty exertional, semi-skilled" position. (Tr. at 40-41, 58)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not,

the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such

4

factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to this subpart.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in

reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2017. (Tr. at 22, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity during the period from December 6, 2013 through his date last insured ("DLI") December 31, 2017. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments through his DLI: chronic cervical and lumbar strain; osteoarthritis; cognitive disorder; and anxiety disorder. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded that through his DLI, Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 23, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work through his DLI

> except he could frequently stand and walk, balance, stoop, kneel, and crouch; occasionally crawl or climb ladders, ropes, or scaffolds; needed to avoid more than occasional exposure to extreme cold, wetness, humidity, and vibration; could never work at unprotected heights or around moving machinery; could perform repetitive one and two-step work activities; and could never interact with the public.

 (Tr. at 24, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing his past relevant work through his DLI. (Tr. at 28, Finding No. 6) In addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience and RFC, the ALJ determined that through

his DLI, there were other jobs that existed in significant numbers in the national economy that Claimant could performed. (Tr. at 29, Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from April 24, 2012 through his DLI of December 31, 2017. (Tr. at 30, Finding No. 11)

## Claimant's Challenges to the Commissioner's Decision

In support of his appeal, Claimant asserts that the ALJ failed to fully develop the medical evidence of record with respect to his impairments; that the ALJ also failed to properly evaluate Claimant's impairments in combination; and that these errors are compounded by the ALJ's disregard of Claimant's treating physicians' opinions that support Claimant's claim for disability by substituting the opinions of non-treating State agency physicians. (ECF No. 16 at 11-13) Claimant requests this Court reverse the final decision for an award of benefits or to remand to correct these errors. (Id. at 14)

In response, the Commissioner asserts that the ALJ fully developed the record and that the substantial evidence supported the weight afforded to the medical opinion evidence, and notes that the evidence concerning both Claimant's physical and mental impairments did not support any greater functional limitations than those established in the RFC assessment. (ECF No. 18 at 9-13) Next, the Commissioner argues that no evidence supported a finding that Claimant's impairments collectively met or medically equaled the severity of a Listing; no physician of record found that any of Claimant's impairments met a Listing or even opined he was disabled. (Id. at 13-17) The Commissioner states that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 17-18)

**The Relevant Evidence of Record**[3]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Consultative Examiner Reports:

On March 13, 2013, Lester Sargent, M.A. provided an adult mental status examination of Claimant in connection with his application for benefits. (Tr. at 393-398) Claimant stated that he was applying for benefits due to experiencing anxiety attacks at work and high blood pressure. (Tr. at 394) He described gradual depression symptoms that had increased over the years which became worse after having been laid off from work. (Id.) He described a persistently depressed mood every day for the past several months associated with the loss of interest in activities, unsatisfying sleep, helplessness, pessimism about the future, feelings of worthlessness, failure, guilty, and shame. (Id.) Claimant also reported a history of panic attacks and a fear of additional attacks associated with heart palpitations, chest discomfort, difficulty breathing, fear, trembling, and sweating. (Id.) He endorsed excessive anxiety in places for which it might be difficult to escape if he were to have a predisposed attack. (Id.) Claimant reported agoraphobic fears typically involving places outside the home such as being in a store, standing in line or riding in an automobile. (Id.) He also reported excessive anxiety and worry occurring for more days than not during the past six months which was associated with difficulty concentrating, restlessness, muscle tension, irritability, edginess, and difficulty making daily decisions. (Id.)

During the mental examination, Mr. Lester made the following observations: Claimant was cooperative; had poor eye contact; was coherent and had connected speech; was fully oriented; his

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

mood was remarkable for anxiety and depression; he exhibited restricted affect; his thought processes and thought content were normal; his judgement was mildly deficient and insight was fair; his immediate memory was normal, recent memory was mildly deficient, and remote memory was mildly deficient; his concentration was moderately deficient, persistence was mildly deficient, and pace was normal. (Tr. at 395-396) Mr. Lester noted Claimant's social functioning was moderately deficient. (Tr. at 396) Mr. Lester diagnosed major depressive disorder, single episode, moderate; panic disorder with agoraphobia; generalized anxiety disorder; hypertension, cervical radiculitis, and back pain he based on Claimant's report and his review of the records. (Id.)

Mr. Lester provided the diagnostic rationale for major depressive disorder based on Claimant's development of depressive symptoms for the past several years and that they had been increasing since his layoff in April 2012; for panic disorder due to Claimant's report of recurrent and unexpected panic attacks and the symptoms associated therewith and his avoidance of places outside the home; for generalized anxiety disorder based on Claimant's report of excessive anxiety and worry. (Tr. at 396-397) Mr. Lester gave Claimant a poor prognosis. (Tr. at 397)

On November 21, 2013, Kip Beard, M.D. performed a consultative examination in connection with Claimant's application for disability. (Tr. at 414-419). Claimant presented with chief complaints of high blood pressure, back and neck problems, breathing problems, and stomach problems. (Tr. at 414) Claimant reported that he had problems with his stomach for the last 5-6 years which included recurrent nausea, dry heaving and sometimes bilious emesis as frequent as every two to three days. (Id.) Claimant reported that this occurs when he gets nervous. (Id.) Regarding his bilateral leg pain, Claimant reported having leg cramps every other day or so and more frequently if he lies on a certain side while in bed; he has had no evaluation of these

symptoms. (Id.) Claimant reported that his neck and back pain were worse since 2000 and that an MRI taken in 2005 or 2006 showed "nerve damage"; Claimant never had a nerve conduction study and reported his neck and back pain were constant, graded 10/10, and ran into his shoulders and down to his arms. (Id.)  Claimant stated that his fingers go numb and was worse with work when lifting, carrying, shoveling, doing yard activities, and taking out the trash. (Tr. at 415) He noted that medication had helped with his pain in the past. (Id.)

After his examination, Dr. Beard made the following findings: Claimant's abdominal evaluation was unremarkable; Claimant's heart and lungs were normal; and Claimant's neck "revealed some mild motion abnormalities, but no neurologic compromise … no cervical radiculitis … no evidence of myelopathy either." (Tr. at 418) Dr. Beard noted Claimant presented without ambulatory aids and ambulates with a normal gait. (Tr. at 416, 418) Additionally, he observed that Claimant could stand unassisted, arise from a seat, and step up and down from the examination table without difficulty and he appeared comfortable while seated and supine. (Tr. at 416)

On January 19, 2016, Steven Nutter, M.D. performed an internal medicine examination on Claimant in connection with his disability application. (Tr. at 593-597) Dr. Nutter noted pain, tenderness, and decreased range of motion of the cervical and lumbar spine. (Tr. at 596) Dr. Nutter further noted that Claimant's straight leg raise test was negative, and he found no evidence of radiculopathy except for some sensory testing abnormalities in the left foot. (Id.) Claimant did not report any radicular symptoms and was uncertain of the cause of his numbness. (Tr. at 596-597)

Dr. Nutter believed Claimant may have signs of degenerative arthritis but there was no evidence of rheumatoid arthritis. (Tr. at 597) On physical examination, there were no rheumatoid

nodules, capsular thickening, periarticular swelling or tophi, or lunar deviation. (Id.) His muscle strength was 5/5 in the upper and lower bilateral extremities, and there was no evidence of atrophy. (Tr. at 596) His impressions were chronic cervical and lumbar strain and osteoarthritis. (Id.)

On January 25, 2016, Cherie Zeigler, M.A. provided a neuropsychological screening profile on Claimant and found a "mild neuropsychological disorder without behavioral disturbance" and "unspecified anxiety disorder." (Tr. at 604-608) Ms. Zeigler assessed Claimant based on a clinical interview, mental status examination, Wechsler Adult Intelligence Scale-IV (WAIS-IV) and Cognistat. (Tr. at 604) Claimant scored a 79 full scale IQ on the WAIS-IV, which Ms. Zeigler noted was congruent with his high school education. (Tr. at 606-607) He obtained average scores in eight of the eleven Cognistat subtests. (Id.) He obtained scores in the mild range for calculation and judgment, and a severe score for memory. (Tr. at 607)

On mental status examination, Claimant appeared "fair;" he was cooperative and attentive; oriented to person, place, time and situation; had slow and marked speech; anxious mood; nervous affect; agitated psychomotor behavior; circumstantial thought processes; relevant thought content upon redirection; normal perception with no report of illusions or hallucinations; good insight; poor judgment based on his response to one question; no suicidal or homicidal ideations; mildly deficient to deficient memory; average attention; mildly deficient persistence; slow pace; and mildly deficient social functioning. (Id.)

Ms. Zeigler suggested diagnoses of mild neurocognitive disorder without behavior disturbance and unspecified anxiety disorder. (Tr. at 608) She based the first diagnosis on her clinical observation of memory difficulty at the evaluation, Claimant's self-reports, and his concussion record. (Id.) The second diagnosis was based on Ms. Zeigler's clinical observation of

nervousness during the evaluation, Claimant's self-reports, and the record. (Id.) She opined that Claimant's prognosis was poor as he had serious injuries resulting in neurocognitive problems, and that he would be able to manage his own benefits if awarded. (Id.)

State Agency Opinion Evidence:

On January 26, 2016, at the initial level of review, Narendra Parikshak, M.D. opined Claimant could perform a range of medium work and could climb ladders/ropes/scaffolds and crawl occasionally and climb ramps/stairs, balance, stoop, kneel and crouch frequently. (Tr. at 86-87) He also opined Claimant should avoid extreme cold, wetness, humidity, noise, vibration, poor ventilation, and hazards. (Tr. at 87) Dr. Parikshak based these postural limitations on Claimant's normal gait, straight leg raise without limitations, "forward flexion to 60 degrees and slight difficulty with squatting," "knee with some crepitus and ROM 120+ degree[s]," and BMI 25+". (Id.) He based the environmental limitations on the consultative examiner's report, Claimant's ability to hear and understand conversational voices, and normal post-facilitation stretch. (Id.)

Jeff Harlow, Ph.D. found that Claimant had no limitations with his memory, understanding and adaptation but did have limitations with respect to his concentration, persistence, and his social interactions. (Tr. at 90) As a result, Dr. Harlow opined Claimant was limited to unskilled, repetitive one-and-two step work like activities. (Tr. at 89)

On reconsideration, state agency physician Rogelio Lim, M.D. and state agency psychologist Jeff Boggess, Ph.D. agreed with the physical and mental limitations found at the initial level. (Tr. at 92-108)

Hospitalization Records:

On April 23, 2014, Claimant was admitted to Cabell Huntington Hospital while intoxicated

after a fight. (Tr. at 422) He sustained multiple facial fractures, including a mandible fracture during the fight. (Tr. at 427) On April 26, 2014, Farid Mozaffari, M.D., surgically repaired Claimant's jaw and he was discharged the following day with his pain well-controlled. (Tr. at 427, 465-466) His discharge diagnosis was closed fracture of mandible, multiple sites. (Tr. at 427)

On August 28, 2014, Claimant was admitted as a trauma patient at the Charleston Area Medical Center after an ATV accident. (Tr. at 496) He sustained multiple facial, rib and spinal fractures, in addition to a right-sided pneumothorax. (Tr. at 500) Claimant was initially intubated at an outside facility then transferred to the CAMC trauma care service, then transferred from the ICU to the stepdown unit. (Id.) Providers found Claimant a nonoperative candidate due to reossification and prior mandibular maxillomandibular fixation; he was discharged home in stable condition and instructed to take his medications as needed and to follow up in the trauma clinic in two weeks for a chest x-ray. (Id.) Claimant was advised to avoid heavy lifting or activity with flexion or extension of the spine. (Tr. at 501)

Marshall Psychiatric and Behavioral Medicine Records:

Claimant attended therapy sessions from September 2013 through June 2014 with Michael Goldman, MSW. (Tr. at 484-493) On September 24, 2013, Claimant presented to Mr. Goldman for depression and anxiety. (Tr. at 411-412, 492-493) Mr. Goldman observed Claimant to be "obviously nervous on entry" as he had never been to a therapist before and was noted to be somewhat guarded at first. (Tr. at 411, 492) Mr. Goldman found Claimant to be alert and oriented with normal psychomotor function. (Tr. at 412, 493) Their rapport was "slowly but effectively established." (Id.) While Claimant's mood was noted to be depressed and anxious, his thought content was normal, logical, linear and goal directed. (Id.) His insight was fairly good and his

intelligence was estimated to be average. (Id.) Mr. Goldman suggested diagnoses of moderate single episode major depression, panic disorder without agoraphobia, and anxiety disorder not otherwise specified. (Id.)

Claimant returned to Mr. Goldman in December 2013 for support counseling due to the recent loss of his mother. (Tr. at 491) From January 2014 through May 2014, Mr. Goldman counseled Claimant related to dealing with his father's illness and death; on May 22, 2014, Mr. Goldman noted that Claimant was making progress despite grieving the loss of his father. (Tr. at 487) Claimant reported that he had been attacked by the sons of a woman who moved into his father's home when he went to evict them; one of the sons hit Claimant from behind causing him to lose consciousness resulting in Claimant being hospitalized in ICU from some days and still recovering from reconstructive surgery. (Tr. at 487) By June 2014, Claimant reported that talking things out with Mr. Goldman was helpful and that he was comfortable expressing himself; Mr. Goldman described Claimant as having "an innate wisdom." (Tr. at 485) Mr. Goldman noted Claimant's mood was stable, though dysphoric, his affect somewhat restricted with normal thought content and good insight. (Tr. at 484) His assessment was anxiety disorder, grief reaction, moderate major depression, single episode, and panic disorder without agoraphobia. (Id.)

Boone Memorial Hospital Medical Clinic Records:

On February 15, 2011 Claimant was established as a new patient with James Walker, D.O., when he complained of having an anxiety attack in September 2010 and was seen at the Emergency room at St Mary's Medical Center. (Tr. at 387) Claimant reported that he sees Dr. Seigel for "nerve damage" from a prior ATV accident. (Id.) Dr. Walker assessed Claimant with "HTN, anxiety and neck pain". (Id.)

On May 16, 2012, Claimant returned to Dr. Walker and presented with a history of chronic neck pain and ulnar neuropathy. (Tr. at 379, 567) Dr. Walker noted that Claimant's hypertension had been fairly well controlled lately and that Claimant had "quite a bit of anxiety and depression" and had been recently laid off from his place of employment after 23 years. (Id.) Dr. Walker had treated Claimant's depression with Wellbutrin, which was "working well for him." (Id.) Dr. Walker diagnosed chronic neck pain, ulnar neuropathy, agitated depression and hypertension and refilled Lorcet 7.5mg and Klonopin 0.5mg as well as Wellbutrin SR 150 mg. (Id.)

On February 20, 2013, Claimant returned to Dr. Walker for check-up and prescription refills. (Tr. at 401) He reported that his medical issues interfered with his sleep, household activities and work. (Id.) Dr. Walker noted the causes for this were heightened anxiety, intense anger and pain as well as tobacco use and stress; numerous "risk factors" were also noted, including dyslipidemia, family history, tobacco use and physical inactivity. (Id.) A physical examination indicated problems with his cervical range of motion and crepitus and reproduction of radicular symptoms with cervical rotation and side bending; intense anxiety and an anxious and depressed affect were also noted. (Tr. at 402)

On April 11, 2013, Claimant returned to Dr. Walker reporting complaints of some sinus drainage and vomiting phlegm in the morning time. (Tr. at 400) Dr. Walker assessed chronic neck pain with cervical radiculitis – stable, hypertension, depressive disorder – improved, and chronic allergic rhinitis. (Id.) Dr. Walker recommended that Claimant use a nasal steroid spray and daily antihistamine of choice before exploring prescription options. (Id.)

On August 6, 2013, Dr. Walker noted that Claimant was having problems with his blood pressure elevating at times when "he is [in] more pain or he has more aggravating." (Tr. at 406)

He noted that Claimant reported that his pain medicine enables him to mow the lawn, weed eat and do some light housework, although the pain radiates from his neck down both shoulders and upper arms and he has numbness and tingling in his fourth and fifth fingers. (Id.) Dr. Walker observed Claimant's neck had crepitus with range of motion and irritability with rotation left and right and with extension in particular and that these "[m]options mimic the radicular symptoms to both shoulders and upper extremities." (Id.) Grip and pinch were equal in both upper extremities. (Id.) His assessments were: cervical radiculitis, hypertension, depression, insomnia, cough with questionable etiology, GERD/nausea. (Id.) Dr. Walker sent Claimant for a chest x-ray, ultrasound of the gallbladder and a barium swallow and advised Claimant to take his Remeron 15 mg at bedtime as instructed. (Id.) A chest x-ray indicated no acute infiltrate. (Tr. at 408, 518)

On January 30, 2014, Dr. Walker noted that Claimant's blood pressure "is improved with beta blocker" (Tr. at 531) although Claimant reported chronic back pain and radiculopathy and pain and numbness in the left and right arm. (Tr. at 532) Dr. Walker further noted Claimant was able to understand and had adequate memory and that he was taking his medications as prescribed and following his treatment plan at home. (Id.) A physical exam indicated that Claimant was anxious and "in obvious pain" with limited range of motion in his head/neck. (Id.)

On April 2, 2014, Claimant presented for his follow-up appointment reporting sinus congestion. (Tr. at 534-536) Claimant also reported joint stiffness and chronic back pain with right extremity pain and numbness greater than his left as well as tingling and loss of sensation. (Tr. at 535) No pain was elicited on straight leg testing bilaterally with patellar reflexes intact; head and neck had limited range of motion and tenderness. (Id.) Dr. Walker noted Claimant's thoughts and cognition were intact. (Id.)

16

On July 23, 2014, following an ATV rollover on July 3rd, Claimant reported to Dr. Walker that "he's doing better with respect to the anxiety and panic episodes." (Tr. at 541) Dr. Walker observed that he walked with crutches and had a right ankle cast. (Tr. at 543) Dr. Walker noted Claimant's head, neck, spine, ribs, pelvis had limited range of motion and tenderness and that both upper/lower extremities and paraspinal musculature were intact with no atrophy. (Id.) Dr. Walker further noted that Claimant's cognition was intact and that his anxiety was "[g]reatly improved." (Id.)

On June 15, 2015, Claimant returned for prescription refills and reported that he stopped taking Mirtazapine for sleep because it often caused restless periods and denied other issues with his medications. (Tr. at 560) A physical examination revealed he was in no acute distress (Tr. at 561) and psychologically, Claimant exhibited full orientation, appropriate affect and intact insight and that he was able to understand, follow instructions and had adequate memory. (Tr. at 561-562)

On July 15, 2015, Claimant returned for his regular follow-up appointment for prescription refills and reported no new complaints or concerns. (Tr. at 564-566) Dr. Walker noted Claimant was having some problems with depression complicated by his father's death and that his chronic neck pain and hypertension was exacerbated by medical office visits and stress. (Tr. at 566) Dr. Walker noted Claimant's neck had "irritable range of motion with side bending left and right as well as with rotation" as well as "very subtle decreased grip on the left side compared to the right." (Id.)

On October 12, 2015, Claimant returned to Dr. Walker for follow-up and reported increased pain in his neck and back. (Tr. at 576-578) It was noted that Claimant was experiencing radicular symptoms to both upper extremities that was a little worse on the right side recently. (Tr.

at 577) Again, Dr. Walker noted that Claimant's neck had "crepitus with irritable range of motion, especially with sidebending left and right and rotation left and right" and that he was alert, fully oriented, and somewhat depressed in mannerisms but quite anxious with increased psychomotor activity during the interview and the examination. (Tr. at 578) Dr. Walker refilled his prescription for chronic pain and advised that Claimant "try to get outside some, getting some sunshine and given his condition increase his activity level somewhat" as well as to "avoid heavy lifting, pulling, pushing . . . and ladders." (Id.)

On November 17, 2015, Dr. Walker wrote a letter indicating that he had been Claimant's treating physician since February 15, 2011 and that he sees Claimant every two to three months for follow-up, with his most recent visit on October 12, 2015. (Tr. at 575) Dr. Walker opined that "[a]t this time, Mr. Hundley is unable to return to work. We will revisit his ability to return to full-time employment on his next office exam." (Id.) Dr. Walker stated that Claimant was scheduled to return in January for a recheck. (Id.)

On January 7, 2016, Claimant presented to Dr. Walker with complaints of GERD, chronic neck pain, agitated depression, stress and panic disorder. (Tr. at 581, 588) Dr. Walker noted Claimant appeared alert, oriented and somewhat anxious in appearance, cooperative and mildly depressed and that his neck exhibited "crepitus with irritable range of motion in all planes of testing with sidebending left and right seeming to reproduce the symptoms primarily to the left shoulder and upper extremity." (Tr. at 583, 590) Dr. Walker refilled Claimant's prescription for chronic pain and advised that he "remain as active as he could given his physical condition" and to avoid heavy lifting or carrying objects, and no pulling, pushing or prolonged sitting. (Id.) Claimant was to return in three months for recheck. (Id.)

18

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he is unable to work because he fractured his back, has nerve damage in his neck and he began to have anxiety attacks. (Tr. at 41) Once, he was taken from the shop one day to be hospitalized due to an anxiety attack. (Id.) He explained that stress triggers them, as often as every week or week and a half and can last an hour or longer. (Tr. at 42) He testified that he also has pain in his neck and back and that it goes to his arms and causes numbness below his elbows and right between his fingers. (Id.) Claimant testified that his neck and back hurt daily; movement makes the pain worse, and he takes medication for the pain. (Tr. at 43) Claimant also suffered from daily headaches. (Tr. at 44)

Claimant testified that his blood pressure "jumps around" and he uses a cuff to check it. (Tr. at 44-45)

Claimant explained that his medication makes him drowsy at times; his depression and anxiety medication "takes the edge off", but it does not eliminate his depression and anxiety. (Tr. at 45)

Claimant denied having physical therapy, but he sees a chiropractor that gives him some relief for a little bit. (Tr. at 46) He does not use a brace or splint, though when he fractured his back he used one because he also had rib fractures and he had to be strapped down to avoid moving due to a punctured lung. (Tr. at 46, 53) Claimant has a TENS unit, but believes it doesn't go "deep enough" to help. (Id.) Claimant does not use a cane. (Tr. at 46) He has tried using heating pads and cold packs, but stated that after using the cold pack, once it warms back up, he feels the same as he did before. (Tr. at 47)

Claimant went a few times to see a counselor for his depression, but he did not have money so he had to quit going. (Id.)

Claimant estimated that he could probably walk a block or block and a half; he could stand for about ten minutes before he had to sit back down and sit for about ten to fifteen minutes before he had to stand up. (Tr. at 48) He guessed he could lift a 12-pack of soda, but couldn't bring it up above his shoulders to put it on a shelf or something. (Tr. at 49) Claimant explained that he has problems with reaching because part of his arm and fingers go numb. (Id.)

Claimant testified that he also has problems with his memory, concentration and focus. (Tr. at 49-50) He can tolerate a few people around him, but tries to stay to himself. (Tr. at 50) He also has trouble sleeping and will take at least one nap, about two hours or so, during the day. (Tr. at 50-51) He testified that he is also easily distracted by people and finds that he can't keep with when people move around and talk a lot. (Tr. at 54)

Claimant resides with his mother and helps with certain household chores such as taking out the trash or helping with groceries; he doesn't prepare meals, pay bills or go shopping, but he will take his mother to the store and she does the shopping. (Tr. at 51) He has no problems with self-care. (Id.)

Claimant does not go out anywhere, and though he had hobbies in the past, he no longer has any because he has lost interest in things he used to enjoy. (Tr. at 52) In a typical day he will watch TV or "look at it" for the background noise and in good weather he sits outside where nobody can gawk at him. (Id.) He testified that he was diagnosed with agoraphobia due to his fear of being out in public and going to unfamiliar places. (Tr. at 54)

Jeffrey M. Nocera, Vocational Expert ("VE") Testimony:

The ALJ asked the VE to assume a hypothetical individual with Claimant's age, education, work history who was limited to a range of light work; can frequently stand and walk, balance, stoop, kneel and crouch; can occasionally crawl or climb ladders or scaffolds; should avoid more than occasional exposure to extreme cold, wetness, humidity and vibration; can never work at unprotected heights or around moving machinery; can perform repetitive one and two-step work activities; and can never interact with the public. (Tr. at 58) In response, the VE testified that such an individual could not perform Claimant's past work, but could perform the following light unskilled jobs: cleaner and polisher; finish inspector; and garment sorter. (Tr. at 58-59) The VE further testified that should the individual be off task 20% of the workday, the individual could perform no work in the national economy. (Tr. at 59) The VE stated his testimony was consistent with the Dictionary of Occupational Titles and with regard to the off-task time, based upon his experience working with employers in the national economy. (Id.)

In response to questioning by Claimant's attorney, the VE confirmed that if the individual were to be off task at least 15-20% with carrying out detailed instructions, ability to maintain attention and concentration for long periods of time and working in proximity to others without distractions, then the individual would be precluded from any and all jobs. (Tr. at 59-60)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

their duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with such

decision." Blalock, 483 F.2d at 775.

**Analysis**

As noted *supra*, Claimant has taken the position that in addition to the ALJ's failure to fully

develop the evidence of record, which he contends establishes his claim for disability when

considered in combination, the ALJ also improperly evaluated the opinion evidence, giving more

credit to the opinions of non-examining physicians who only reviewed portions of Claimant's file,

ostensibly, they rendered opinions without the benefit of a review of the complete record.

The Duty to Develop the Evidence:

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help

develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated

that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the

issues necessary for adequate development of the record, and cannot rely on evidence submitted

by the claimant when that evidence is inadequate." Id. The court explained that the ALJ's failure

to ask further questions and to demand the production of further evidence about the claimant's

arthritis claim in order to determine if it met the requirements in the listings of impairments amounted to a neglect of his duty to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he is disabled.  20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled." Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment, further, the Regulations are clear that this responsibility is ongoing at each level of the administrative review process.  Id. The Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings.  It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step.  The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . .  If the process ends at step two, the burden of proof never shifts to the Secretary.  . . .  It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, she is not required to act as Claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-831 (8th Cir. 1994). In this case, Claimant was represented by counsel and the ALJ has the right to assume that Claimant's counsel was presenting the strongest case for benefits. See Laney v. Astrue, 2011 WL 11889, at *11 (S.D.W.Va. Jan. 4, 2011) (M.J. Eifert) (citing Nichols v. Astrue, 2009 WL 2512417, at *4 (7th Cir. 2009). An ALJ's duty to develop the record does not require her to make specific inquiries into

Claimant's treatment modalities or search for cumulative evidence; her duty is obtain sufficient evidence upon which she can render an informed decision. Id. (internal citations omitted).

Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

The ALJ in this case expressly considered the medical evidence from December 2013 through January 2016[4] which included not only consultative examiner reports concerning Claimant's physical and mental impairments, but also treatment records from his primary care physician, Dr. Walker, as well as records from his therapist, Mr. Goldman. (Tr. at 25-28) The ALJ also considered the opinions provided by the State agency consultants. (Tr. at 27, 28) The ALJ acknowledged Claimant's hearing testimony, which included his complaints of suffering from anxiety attacks, lack of sleep, low energy, lack of interest in activities, and that his medications and counseling has provided some help. (Tr. at 25) The ALJ further noted and considered Claimant's testimony regarding his daily neck and back pain, his complaints of numbness in his elbows and fingers, what exacerbates his pain symptoms, what he does for relief as well as treatment he received for these symptoms. (Id.) The ALJ also considered Claimant's testimony concerning the side effects from his medication, his forgetfulness and lack of focus, his personal

---

[4] This period is significant because the ALJ denied the implied request for reopening Claimant's prior application because no new evidence was submitted that was material to the December 5, 2013 decision denying his claim, despite the fact Claimant has alleged an onset of disability that is within the previously adjudicated time period. (Tr. at 20) However, the ALJ presumably considered the evidence preceding the December 5, 2013 on account of the numerous exhibits attached to the written decision. (Tr. at 34-35)

care, as well as his avoidance of public spaces. (Id.)

Claimant does not specify what evidence the ALJ lacked in order to make an informed decision. Nevertheless, it is clear that the ALJ made numerous references throughout her decision concerning the evidence of record, which included Claimant's own statements concerning the frequency and limiting effects of his impairments. Indeed, as pointed out by the Commissioner, Claimant underwent two consultative examinations, one by Dr. Nutter and another by Ms. Zeigler, in order to develop the record since his prior consultative examinations by Dr. Beard and Mr. Sargent. (ECF No. 18 at 1) Accordingly, the undersigned **FINDS** that Claimant's contention that the ALJ erred by failing to develop the record is without merit.

The Combination of Impairments:

Although Claimant points out that the medical records indicated that he suffered from numerous impairments both mental and physical, he does not specify which impairment specifically meets or equals any Listing. The Regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. § 404.1523(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful

activity. Id. In short, the ALJ must analyze the cumulative or synergistic effect that the various impairments have on Claimant's ability to work. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

"The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." See 20 C.F.R. § 404.1525(a); Sullivan v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that his combination of impairments is "equivalent" to a listed impairment, and he "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531. A claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

The ALJ herein first evaluated Claimant's impairments under Section 1.00 which pertains to the musculoskeletal system. (Tr. at 23) She noted that none of the examining or treating physicians' reports showed that Claimant had ambulatory deficits as described in Section 1.00(B)(2)(b) as required under Section 1.02(A) through his DLI and referenced Exhibits 8F, 12F, 13F, 14F, and 16F. (Tr. at 23, 414-421, 516-574, 575-580, 581-587, 593-603)[5] Based on this medical evidence, the ALJ also determined that they did not indicate Claimant had neurological deficits as required under Section 1.04(A) through his DLI. (Id.) Therefore, the ALJ determined Claimant did not have an impairment or combination thereof equal in severity to any listed impairment, "as no treating or examining physician mentioned findings equivalent in severity to the criteria of any listed impairment." (Tr. at 23)

Under Section 1.00(B)(2), "[t]o ambulate effectively, individuals must be capable of

---

[5] These records included the Consultative Examination Report provided by Dr. Beard, the medical records from Dr. Walker from June 2011 through January 2016, and the Consultative Examination Report provided by Dr. Nutter.

sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school." Under Section 1.04(A), there must be

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

As demonstrated by the medical evidence of record, *supra*, there is no evidence of this which would support Claimant's argument that his physical impairments alone would have met Listing requirements. The ALJ acknowledged that Dr. Walker diagnosed Claimant with chronic neck pain, radiculopathy and cervical radiculitis and that he treated his neck pain with medication. (Tr. at 25, 516-574) After Claimant's ATV accident in August 2014, the ALJ noted that Dr. Walker diagnosed acute lower back pain and treated him with pain medication. (Tr. at 25, 516-580) The ALJ found that the "overall evidence shows that Dr. Walker adequately managed the claimant's neck and back impairments conservatively with pain medication. (Tr. at 26, 516-580) The ALJ also noted that Dr. Walker had observed "mild findings of irritable range of motion of the cervical spine, left shoulder, and left arm; very subtle decreased grip on the left side; tenderness, paraspinal muscle spasticity, and limited motion of the spine; and an antalgic gait (Exhibits 12F/39, 51; 13F/4; 14F/3)." (Tr. at 26, 554, 566, 578, 583)[6]

The ALJ also considered the evidence from Dr. Nutter, noting that Dr. Nutter diagnosed Claimant with osteoarthritis and chronic cervical and lumbar strain. (Tr. at 26, 593-603) The ALJ further noted that Dr. Nutter observed Claimant to have "a normal gait without the use of a

[6] These records were dated October 30, 2014, July 15, 2015, October 12, 2015, and January 7, 2016, respectively.

handheld assistive device and he appeared stable at station and comfortable in the supine and sitting positions." (Id.) It was noted that Claimant had bilateral hip pain with motion testing, tenderness to palpation of the left hip, and some crepitus of the knees; Claimant had pain and tenderness to the paraspinal muscles and the spinous processes of the cervical spine; there was no evidence of paravertebral muscle spasm of the lumbar spine; Claimant had decreased range of motion in both his cervical and lumbar spines. (Id.) The ALJ recognized that Dr. Nutter noted the straight leg raise test was normal, that Claimant had normal muscle strength at 5/5 bilaterally in both upper and lower extremities, and that Claimant's sensory modalities were well preserved except for loss of pinprick in the left third, fourth, and fifth toes. (Id.)

Next, the ALJ considered the severity of Claimant's mental impairments and also found that "considered singly and in combination, did not meet or medically equal the criteria of listings 12.02 and 12.06." (Id.) In understanding, remembering, or applying information, the ALJ determined Claimant had a moderate limitation based on the evidence showing that he had a "mild neurocognitive disorder (Exhibit 17F)"; he obtained a full-scale IQ of 79; he exhibited "mildly deficient immediate memory, deficient recent memory, and mildly deficient remote memory." (Tr. at 23, 604-609)[7] In interacting with others, the ALJ found that Claimant also had moderate limitations based on his testimony that he experienced anxiety attacks and cannot tolerate crowds; that he preferred to stay home; and that he exhibited moderately deficient social functioning during the consultative examination. (Tr. at 24, 393-399)[8] In concentrating, persisting, or maintaining pace, the ALJ found that Claimant had a moderate limitation based on his reports of having trouble concentrating and focusing and that he exhibited average concentration, mildly deficient

---

[7] The ALJ was referencing Ms. Zeigler's Consultative Examination Report.
[8] The ALJ was referencing Mr. Sargent's Consultative Examination Report.

persistence, and slow pace during the consultative examination. (Tr. at 24, 604-609)[9] Finally, with regard to adapting and managing oneself, the ALJ found that Claimant had a mild limitation based on his report that he showered and dressed himself, took out the trash, drove, and attended appointments, although he stated that his mother cooked, paid the bills and shopped. (Id.)

Having determined that Claimant's mental impairments did not result in any "marked" or "extreme" limitations, the ALJ found that no "paragraph B" or "paragraph C" criteria had been met as "[t]here is no evidence of anxiety disorder resulting in complete inability to function independently outside the area of one's home." (Tr. at 24)

Later in the decision, the ALJ discussed the medical and other evidence as it related to Claimant's mental impairments. (Tr. at 26-27) First, the ALJ acknowledged that the medical record showed that Claimant had a history of anxiety, having reported to medical providers that he was depressed and anxious around crowds, as well as being irritable, having less interest in activities and was socially isolated, and that he experienced poor sleep, forgetfulness and poor concentration. (Tr. at 26, 411-413, 484-494, 516-574, 581-587)[10] In response to these conditions, the ALJ noted that Claimant received psychotropic medications from Dr. Walker (Tr. at 26, 516-574) and therapy from Mr. Goldman (Tr. at 26, 484-494); However, Claimant had worsening symptoms following his father's death in January 2014. (Id.) The ALJ noted also that Claimant reported to Mr. Goldman that therapy helped with his grief, but he quit going to therapy after his June 2014 appointment. (Id.)

The ALJ found that records demonstrated that Dr. Walker "adequately managed the claimant's anxiety with medication." (Tr. at 26, 516-574, 575-580, 581-587) It was noted that

[9] The ALJ again referred to Ms. Zeigler's Consultative Examination Report.
[10] The ALJ referenced the treatment records from Mr. Goldman and from Dr. Walker.

Claimant reported to Dr. Walker that was doing better with his anxiety and panic episodes in July 2014 (Tr. at 26, 516-574), that Dr. Walker noted mild findings of full orientation and intact cognition in March 2015 (Tr. at 26, 556)[11], and that Dr. Walker further noted full orientation, appropriate affect, and intact insight in June 2015. (Tr. at 26, 562) Dr. Walker's treatment note from October 2015 indicated Claimant did not like to be around crowds and preferred to stay home and that Claimant exhibited "somewhat depressed mannerisms, an anxious presentation, and increased psychomotor activity at that appointment." (Tr. at 26, 578) At his last appointment in January 2016, the ALJ noted that Dr. Walker reported Claimant was fully oriented, "a somewhat anxious appearance, a cooperative attitude, and mildly depressed mannerisms[.]" (Tr. at 27, 583)

Next, the ALJ considered the other evidence of record concerning Claimant's mental conditions, noting that: he graduated high school with average grades, was not enrolled in special education services though he was retained in the eighth grade (Tr. at 27, 393-399)[12]; after being administered the WAIS-IV by Ms. Zeigler in January 2016, he achieved a full-scale IQ score of 79 (Tr. at 27, 604-609); Ms. Zeigler diagnosed Claimant with mild neurocognitive disorder due to Claimant's memory difficulties and history of concussions (Id.); and Dr. Walker "consistently noted intact cognition." (Tr. at 27, 516-574)[13]

Clearly, the ALJ considered the evidence of record with respect to Claimant's physical and mental impairments and correctly determined that despite the myriad of medical conditions Claimant had experienced since he alleged he became disabled, there is no indication in the record

---

[11] The undersigned notes that the date of service for this entry was actually January 16, 2015, and that Dr. Walker reviewed/signed this entry on March 22, 2015. Nevertheless, Dr. Walker indeed noted that Claimant was "oriented x3. Thoughts & Cognition Intact." (Tr. at 558)
[12] The ALJ referenced Claimant's self-reported history given to Mr. Lester during the mental status examination.
[13] The ALJ referenced Dr. Walker's treatment notes dated June 2011 through September 2014.

that supports his contention that his impairments met any Listing criteria. As noted by the ALJ, the record contains no opinion by any physician, treating or examining, that confirms Claimant's impairments met any Listings. (Tr. at 23) Accordingly, the undersigned **FINDS** that Claimant's argument that his impairments, singly or combined, met Listing requirements lacks merit.

<u>The Evaluation of Opinion Evidence:</u>

The Regulations provide the definition for "medical opinions":

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(1). The Regulations further provide that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." <u>Id</u>. § 404.1527(b). "Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion." <u>Id</u>. § 404.1527(c). The Regulations govern how an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. <u>Id</u>. § 404.1527(d)(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." <u>Id</u>. § 404.1527(d)(3).

Claimant has explicitly stated that the ALJ impermissibly "ignored" and "failed to consider" the opinions of his treating physician, Dr. Walker, and his treating therapist, Mr. Goldman. (ECF No. 16 at 12, 13)[14] Claimant indicates that Dr. Walker opined that Claimant's mental and physical diagnoses severely or substantially limited him in his abilities in prolonged sitting, heavy lifting, pulling, pushing, standing, walking, and is "to avoid all ladders." (Id. at 12) As an initial matter, the undersigned has reviewed Exhibits 3F, 5F, 6F and 12F in their entirety and they do not contain of any functional limitations as they relate to any of Claimant's impairments. However, Dr. Walker twice made recommendations pertaining to Claimant's functional limitations: in October 2015 he opined that Claimant was to "increase his activity level somewhat" and "to avoid heavy lifting, pulling, pushing, and must avoid ladders" (Tr. at 578, 586); and in January 2016 he opined that Claimant was to "remain as active as he could given his physical condition, and he is to avoid heavy lifting or carrying objects. No pulling, pushing or prolonged sitting." (Tr. at 583, 590) As pointed out by Claimant, Dr. Walker wrote a letter dated November 17, 2015 (Tr. at 575) wherein he opined that Claimant "is unable to return to work."[15]

With respect to Mr. Goldman's treatment notes which are dated from September 2013 through June 2014, it is noted that these records do not contain any statements concerning functional limitations or what Claimant "can still do despite [his] impairment" that would lend

---

[14] Claimant has referenced Exhibits 3F, 5F, 6F, 12F, 13F and 15F as opinions provided by Dr. Walker that the ALJ ignored. It is noted that Exhibits 3F, 5F, and 6F concern treatment notes that are dated within the previous adjudicated period ending December 5, 2013. (Tr. at 20) Additionally, the ALJ expressly refers to Exhibits 5F and 6F that corroborated Claimant's history of neck pain (Tr. at 25), therefore to the extent that Claimant asserts that the ALJ "ignored" or "failed to consider" these records, his argument lacks merit. Moreover, nearly all of the treatment records contained in Exhibit 3F predate Claimant's alleged onset date with the exception of a single treatment note dated May 16, 2012 (Tr. at 379), however, these records corroborate Claimant's ongoing complaints of neck pain, depression, ulnar radiculopathy, and hypertension – impairments that the ALJ has discussed and reviewed at length in the written decision.

[15] The Commissioner correctly notes that Claimant had been unemployed when this letter was written, however. (ECF No. 18 at 15, n.6)

themselves to a proper evaluation of opinion evidence as entertained by 20 C.F.R. § 404.1527. Although Mr. Goldman referenced Claimant's diagnoses in every therapy note, it is known that diagnoses alone do not establish disability, because there must be a showing of related functional loss. See, <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4th Cir. 1986) (*per curiam*) (internal citations omitted). Nevertheless, the ALJ did refer to Mr. Goldman's therapy notes several times in her decision (Tr. at 23, 26) during her discussion of the evidence, but also acknowledged that Dr. Walker had been treating Claimant for his mental conditions as well. (Tr. at 26-27)[16]

Regarding the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2).[17] Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. <u>Id</u>. § 404.1527(c)(2). Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." <u>Id</u>.

In this case, the ALJ wrote

---

[16] Although there is no indication from Dr. Walker's treatment records that counseling was provided by his office, the record shows that Dr. Walker had been treating Claimant for his mental impairments for several years with medication, before and after the alleged onset date of disability, whereas Mr. Goldman had only been counseling Claimant for less than a year.

[17] The treating source rule has since been eliminated, effective March 27, 2017, however, because this claim predated this rule change, the pertinent Regulations in effect at the time apply. <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u>, 82 FR 5844-01, 2017 WL 168819, at *5853 (Jan. 18, 2017).

Treating physician, James Walker, D.O., opined the claimant needed to avoid heavy lifting, pulling, pushing, and ladders (Exhibits 13F, [1]4F). The undersigned gives little weight to this assessment because it is vague and does not provide specific functional limitations.

(Tr. at 28, 575-580, 581-587)[18] The ALJ then considered Dr. Walker's other opinion:

Dr. Walker also opined the claimant was unable to return to work (Exhibit 13F). A determination as to whether the claimant is disabled or unable to work is an issue reserved to the Commissioner. Opinions as to disability will not be given controlling weight . . . This opinion has been considered and found inconsistent with the overall medical record set forth above.

(Tr. at 28, 575-580)

In contrast, the ALJ gave "great weight" to the opinions provided by State agency physicians, Drs. Narendra Parikshak and Rogelio Lim. (Tr. at 27) The ALJ noted that these physicians had

opined the claimant had the residual functional capacity to perform medium work except could frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, and crouch; occasionally crawl; and needed to avoid concentrated exposure to extreme cold, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (Exhibits 3A, 4A).

(Tr. at 27, 77-91, 92-108) Significantly, the ALJ "reduced the claimant to light work based upon objective evidence of pain and limitation in the back and hips (Exhibit 16F)." (Tr. at 27, 593-603)[19]

As noted by the ALJ, the Regulations specifically reserve disability and work-related determinations solely to the Commissioner, and any opinions with respect to same do not enjoy any special significance. 20 C.F.R. § 404.1527(d). The ALJ previously noted that Dr. Walker's treatment records, particularly with regard to his physical impairments[20], showed that he treated

---

[18] These Exhibits concern Dr. Walker's treatment records dated October 12, 2015 to January 7, 2016.
[19] Here the ALJ refers to the Consultative Examination Report provided by Dr. Nutter.
[20] There is no indication from the records that Dr. Walker's opinions with respect to the exertional limitations (heavy lifting, pushing, pulling, etc.) were due to Claimant's mental impairments.

both Claimant's neck and back pain with medication. (Tr. at 25) The ALJ also determined that from these records, "[t]he overall evidence shows that Dr. Walker adequately managed the claimant's neck and back impairments conservatively with pain medication (Exhibits 12F, 13F)." (Tr. at 26, 516-574, 575-580) The ALJ also acknowledged that Dr. Walker's treatment records showed "mild findings of irritable range of motion of the cervical spine, left shoulder, and left arm; very subtle decreased grip on the left side; tenderness, paraspinal muscle spasticity, and limited motion of the spine; and an antalgic gait (Exhibits 12F/39, 51; 13F/4; 14F/3)." (Tr. at 26, 554, 566, 578, 583)[21] As discussed *supra*, the ALJ then compared the findings made by Dr. Nutter during his examination on January 19, 2016, specifically noting that Claimant had a normal gait, did not use handheld assistive devices, had negative straight leg raise testing as well as normal muscle strength ("5/5") bilaterally in both upper and lower extremities, however, Claimant exhibited decreased range of motion in both cervical and lumbar spines, crepitus of the knees, as well as pain in both hips and tenderness in the left hip. (Tr. at 26)

Arguably, the ALJ's use of the word "light" is harsh, since to the extent that Dr. Walker opined that Claimant should avoid heavy lifting, pulling, pushing, and ladders appears overall consistent with the evidence of record, coupled with the fact that the ALJ herself further reduced Claimant to light work. However, clearly Dr. Walker did not provide "specific functional limitations". It is also significant that when Dr. Walker recommended these restrictions in October 2015, he also recommended that Claimant "increase his activity somewhat." (Tr. at 578, 586) Moreover, in his November 2015 letter, Dr. Walker stated that "[w]e will revisit his ability to return to full-time employment on his next office exam" (Tr. at 575), and at the next office exam

---

[21] The dates of service for these records are October 30, 2014, July 15, 2015, October 12, 2015, and January 7, 2016, respectively.

in January 2016, Dr. Walker recommended Claimant "avoid heavy lifting or carrying objects" as well as "[n]o pulling, pushing or prolonged sitting", but also recommended that Claimant "remain as active as he could given his physical condition." (Tr. at 583, 590) When considering Dr. Walker's opined restrictions and recommendations and comparing them with the medical and other evidence of record, the ALJ's determination that his opinion was "vague" is not error.

The record of evidence on the whole does not suggest that the ALJ merely selected trivial or insignificant inconsistencies "[b]y relying on these limited observations to discredit the treating source opinions . . . while overlooking the record's broader import . . . ."[22] In sum, the ALJ provided "good reasons" for not giving Dr. Walker's opinion controlling weight and provided an adequate explanation for same allowing for meaningful review. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

On a related matter, Claimant has asserted that the ALJ erred by giving more credit to the non-examining State agency physicians' opinions because they "reviewed only portions of [Claimant's] file." (ECF No. 16 at 13) Claimant neither identifies which Exhibit, record or other evidence that the State agency medical and/or psychological consultants should have considered or whether it would have altered their opinions, nor does Claimant provide any further explanation for why he contends their opinions are deficient. The undersigned notes that at the initial level of review, Dr. Harlow provided a mental RFC based on the record of evidence which included Ms. Zeigler's examination report, Mr. Sargent's examination report, Mr. Goldman's therapy notes as well as numerous records from Boone Memorial Hospital Medical Clinic, where Dr. Walker also treated Claimant for his mental conditions. (Tr. at 78-80) This also included Claimant's own

---

[22] Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018); Testamark v. Berryhill, 736 F. App'x 395, 398-399 (4th Cir. 2018).

Functional Report and Pain Questionnaire. (Tr. at 79) Similarly, Dr. Parikshak reviewed all these records, including the consultative examination reports provided by Drs. Beard and Nutter and other providers.

At the reconsideration level of review, the record indicates that in addition to the evidence that had been received at the initial level, additional evidence was also received, which notably included the opinion letter dated November 17, 2015 from Dr. Walker. (Tr. at 95) Regardless, neither Dr. Boggess nor Dr. Lim deemed the evidence significant enough to justify change to the opinions rendered at the initial level of review. In short, Claimant's contention that the opinions provided by the State agency consultants were based only on "portions" of the evidence of record and therefore the ALJ was erroneous to rely upon same is without merit.

Accordingly, the undersigned **FINDS** the ALJ's evaluation of Dr. Walker's opinion is supported by substantial evidence.

### Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 16), **GRANT** the Defendant's request to affirm the decision below (ECF No. 18), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of

objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: July 2, 2019.

Omar J. Aboulhosn
United States Magistrate Judge